**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA**

**HUNTINGTON DIVISION**

**JOHN H.,**

> **Plaintiff,**

**v.**                                                        **Case No.: 3:25-cv-00607**

**FRANK BISIGNANO,
Commissioner of the
Social Security Administration,**

> **Defendant.**

**PROPOSED FINDINGS AND RECOMMENDATIONS**

This action seeks a review of the decision of the Commissioner of the Social Security Administration (hereinafter "Commissioner") denying Plaintiff's applications for disability insurance benefits ("DIB") under Title II of the Social Security Act, 42 U.S.C. § 401–433, and supplemental security income ("SSI") under Title XVI of the Social Security Act, 42 U.S.C. § 1381–1383f. The matter is assigned to the Honorable Robert C. Chambers, United States District Judge, and was referred to the undersigned United States Magistrate Judge by standing order for submission of proposed findings of fact and recommendations for disposition pursuant to 28 U.S.C. § 636(b)(1)(B). Presently pending before the Court are the parties' cross motions for judgment on the pleadings, as articulated in their briefs. (ECF Nos. 6, 7).

The undersigned has fully considered the evidence and the arguments of counsel. For the following reasons, the undersigned respectfully **RECOMMENDS** that Plaintiff's request for judgment on the pleadings be **DENIED**; the Commissioner's request for

judgment on the pleadings be **GRANTED**; the Commissioner's decision be **AFFIRMED**; and this case be **DISMISSED** and removed from the docket of the Court.

## I.　Procedural History

On January 31, 2022, Claimant filed applications for DIB and SSI, alleging disability beginning January 1, 2021, due to seizures, depression, and anxiety. (Tr. at 17, 70, 79, 265). The Social Security Administration ("SSA") denied Claimant's applications initially and upon reconsideration. (Tr. at 68–69, 88–89). Claimant then filed a request for an administrative hearing, which was held on October 30, 2024, before the Honorable Anthony Johnson, Administrative Law Judge (the "ALJ"). (Tr. at 33–67). By written decision, dated December 11, 2024, the ALJ found that Claimant was not disabled as defined by the Social Security Act. (Tr. at 17–28). The ALJ's decision became the final decision of the Commissioner on August 11, 2025, when the Appeals Council denied Claimant's request for review. (Tr. at 1–6).

Claimant timely filed the present civil action seeking judicial review pursuant to 42 U.S.C. § 405(g). (ECF No. 2). Claimant filed a Motion for Judgment on the Pleadings and Brief in Support, and the Commissioner filed a Brief in Support of Defendant's Decision. (ECF Nos. 6, 7). The period within which Claimant could file a reply to the Commissioner's response expired. Consequently, the matter is fully briefed and ready for resolution.

## II.　Claimant's Background

Claimant was 52 years old on his alleged disability onset date and 56 years old on the date of the ALJ's decision. (Tr. at 26). He communicates in English, completed high school, previously worked scanning and loading boxes for FedEx and, before then, in a Walmart warehouse.　(Tr. at 26, 37, 47-49, 264-66).

2

### III.    Summary of ALJ's Decision

Under 42 U.S.C. § 423(d)(5), a claimant seeking disability benefits has the burden of proving a disability. *See Blalock v. Richardson,* 483 F.2d 773, 775 (4th Cir. 1972). A disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable impairment which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A).

The Social Security regulations establish a five-step sequential evaluation process for the adjudication of disability claims. If an individual is found "not disabled" at any step of the process, further inquiry is unnecessary, and benefits are denied. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4). The first step in the sequence is determining whether a claimant is currently engaged in substantial gainful employment. *Id.* §§ 404.1520(b), 416.920(b). If the claimant is not, then the second step requires a determination of whether the claimant suffers from a severe impairment. *Id.* §§ 404.1520(c), 416.920(c). A severe impairment is one that "significantly limits [a claimant's] physical or mental ability to do basic work activities." *Id.* If severe impairment is present, the third inquiry is whether this impairment meets or equals any of the impairments listed in Appendix 1 to Subpart P of the Administrative Regulations No. 4 (the "Listing"). *Id.* §§ 404.1520(d), 416.920(d). If so, then the claimant is found disabled and awarded benefits.

However, if the impairment does not meet or equal a listed impairment, the adjudicator must assess the claimant's residual functional capacity ("RFC"), which is the measure of the claimant's ability to engage in substantial gainful activity despite the limitations of his or her impairments. *Id.* §§ 404.1520(e), 416.920(e). After making this determination, the fourth step is to ascertain whether the claimant's impairments prevent the performance of past relevant work. *Id.* §§ 404.1520(f), 416.920(f). If the impairments

do prevent the performance of past relevant work, then the claimant has established a *prima facie* case of disability, and the burden shifts to the Commissioner to demonstrate, in the fifth and final step of the process, that the claimant is able to perform other forms of substantial gainful activity, given the claimant's remaining physical and mental capacities, age, education, and prior work experiences. 20 C.F.R. §§ 404.1520(g), 416.920(g); *see also McLain v. Schweiker*, 715 F.2d 866, 868-69 (4th Cir. 1983). The Commissioner must establish two things: (1) that the claimant, considering his or her age, education, skills, work experience, and physical shortcomings has the capacity to perform an alternative job, and (2) that this specific job exists in significant numbers in the national economy. *McLamore v. Weinberger*, 538 F.2d. 572, 574 (4th Cir. 1976).

When a claimant alleges a mental impairment, the SSA "must follow a special technique at each level in the administrative review process," including the review performed by the ALJ. 20 C.F.R. §§ 404.1520a(a), 416.920a(a). Under this technique, the ALJ first evaluates the claimant's pertinent signs, symptoms, and laboratory results to determine whether the claimant has a medically determinable mental impairment. *Id.* §§ 404.1520a(b), 416.920a(b). If an impairment exists, the ALJ documents his findings. Second, the ALJ rates and documents the degree of functional limitation resulting from the impairment according to criteria specified in 20 C.F.R. §§ 404.1520a(c), 416.920a(c). Third, after rating the degree of functional limitation from the claimant's impairment(s), the ALJ determines the severity of the limitation. *Id.* §§ 404.1520a(d), 416.920a(d). A rating of "none" or "mild" in the four functional areas of understanding, remembering, or applying information; (2) interacting with others; (3) maintaining concentration, persistence, or pace; and (4) adapting or managing oneself will result in a finding that the impairment is not severe unless the evidence indicates that there is more than minimal

4

limitation in the claimant's ability to do basic work activities. *Id*. §§ 404.1520a(d)(1), 416.920a(d)(1). Fourth, if the claimant's impairment is deemed severe, the ALJ compares the medical findings about the severe impairment and the rating and degree and functional limitation to the criteria of the appropriate listed mental disorder to determine if the severe impairment meets or is equal to a listed mental disorder. *Id*. §§ 404.1520a(d)(2), 416.920a(d)(2). Finally, if the ALJ finds that the claimant has a severe mental impairment, which neither meets nor equals a listed mental disorder, the ALJ assesses the claimant's residual mental functional capacity. *Id*. §§ 404.1520a(d)(3), 416.920a(d)(3). The regulations further specify how the findings and conclusion reached in applying the technique must be documented by the ALJ, stating:

> The decision must show the significant history, including examination and laboratory findings, the functional limitations that were considered in reaching a conclusion about the severity of the mental impairment(s). The decision must include a specific finding as to the degree of limitation in each of the functional areas described in paragraph (c) of this section.

20 C.F.R. §§ 404.1520a(e)(4), 416.920a(e)(4).

In the matter at hand, the ALJ found that Claimant met the insured status requirements of the Social Security Act through September 30, 2027. (Tr. at 20). At step one, the ALJ found that Claimant had not engaged in substantial gainful activity since January 1, 2021, the alleged onset date. (*Id*.). At step two, the ALJ found that Claimant suffered from the severe impairments of seizure disorder and learning disorder. (*Id*.). At step three, the ALJ determined that Claimant did not have an impairment or combination of impairments that met or medically equaled the severity of a listed impairment. (Tr. at 20–22).

The ALJ next found that Claimant had the RFC to perform medium work as defined in 20 C.F.R. §§ 404.1567(c) and 416.967(c), except Claimant could never climb

ladders, ropes, or scaffolds; could never work at unprotected heights or around hazardous machinery; could understand, remember, and carry out simple instructions and perform simple tasks; could maintain concentration, persistence, and pace for two-hour periods over an eight-hour workday in performing simple tasks; could have no production-rate pace work, such as assembly line work; and could have occasional interaction with supervisors, coworkers, and the public. (Tr. at 22–27).

At step four, the ALJ found that Claimant had no past relevant work. (Tr. at 26). At step five, relying on the testimony of a vocational expert ("VE"), the ALJ found that Claimant could perform jobs existing in significant numbers in the national economy, including Material Handler (DOT 727.687-030), Warehouse Worker (DOT 922.687-058), and Inspector (DOT 522.686-014). (Tr. at 27).[1] Accordingly, the ALJ concluded that Claimant was not disabled under the Social Security Act from January 1, 2021, through the date of the decision. (Tr. at 27–28).

## IV.    Claimant's Challenges to the Commissioner's Decision

Claimant argues that the ALJ failed to adequately develop the record concerning his physical and mental impairments, particularly with respect to the evidence from his treating physicians, Dr. Kumar and Dr. McComas. (ECF No. 6 at 8–13). Claimant further contends that the ALJ failed to properly consider the combined effect of his impairments when evaluating disability. (*Id.* at 13–14). In response, the Commissioner maintains that substantial evidence supports the ALJ's decision and that Claimant has failed to identify any reversible error. (ECF No. 7 at 5–12).

---

[1] The Court notes that the vocational expert identified DOT 522.686-014 as "Food Prep Helper," while the ALJ's written decision identified the same DOT code as "Inspector." *Compare* (Tr. at 64) *with* (Tr. at 27). The DOT code remains consistent throughout the administrative proceedings, and Claimant does not raise any challenge concerning the vocational expert's testimony, the DOT classification, or an alleged conflict under SSR 00-4p. Accordingly, the discrepancy in occupational title does not affect the Court's analysis.

6

V.      **Relevant Evidence**

The undersigned reviewed all of the evidence before the Court. The information that is most pertinent to Claimant's challenges is summarized as follows:

*A. Treatment Records*

On August 24, 2019, Nicole Grant, D.O., examined Claimant following complaints of mouth swelling. (Tr. at 444). His medical history included seizure disorder and Bell's Palsy. (Tr. at 444–45). On examination, Claimant's right mandible was tender, edema was present on his lower lip, his dentition was poor, the tooth over his front right mandible was broken, and the right and left sides of his face drooped. (Tr. at 446). Radiology reports concluded that, despite his facial droop, Claimant exhibited no acute facial abnormality; and, despite a history of "strokelike [sic] symptoms," he had no acute chest abnormalities. (Tr. at 448). Ultimately, Claimant was advised to follow up with a primary care provider and see a dentist to address his broken tooth. (Tr. at 449). He was further prescribed Augmentin to combat possible dental infection. (*Id.*).

Thereafter, on September 2, 2020, Carl McComas, M.D., performed a neurological examination of Claimant. (Tr. at 473). Claimant reported a breakthrough seizure approximately six months earlier after missing medication doses. (*Id.*). Dr. McComas noted that Claimant was taking Trileptal for seizure managment. (*Id.*). Dr. McComas reexamined Claimant the following year on October 1, 2021. (Tr. at 471). Claimant's medical and social histories were unchanged, and his examination findings were normal. (*Id.*). Dr. McComas concluded that Claimant's seizures were "better controlled" and elected to continue his schedule of medications. (*Id.*).

On December 14, 2021, Claimant was admitted to St. Mary's Medical Center after suffering two seizures two hours prior while sleeping. (Tr. at 395). Claimant's wife

informed the physicians that Claimant "turned blue" and seized for five minutes before suffering a "focal" seizure twenty minutes later. (*Id.*). During the focal seizure, Claimant reportedly mumbled, and his eyes flickered for one minute. (*Id.*). Claimant told the physicians that he was regularly taking medication for his seizure disorder. (*Id.*). Other than a bout of diarrhea, the physical examination uncovered no abnormalities. (Tr. at 396). A CT scan of Claimant's neck revealed degeneration of the disc between vertebrae C5-C6 as well as wear and tear (spondylosis) to the C5-C6 vertebrae themselves. (Tr. at 399). Physicians increased Claimant's dosage of Trileptal. (Tr. at 399–400).

During neurological follow up on October 3, 2022, Claimant's seizures remained controlled, and Dr. McComas reported Claimant to be "otherwise quite healthy." (Tr. at 469). Dr. McComas referred Claimant to Suresh G. Kumar, M.D., who performed an examination on April 26, 2023. (Tr. at 378). Dr. Kumar noted that Claimant has a history of generalized anxiety disorder ("GAD") and primary generalized epilepsy. (*Id.*). Claimant's mother, who was present, informed the doctor that her son had three seizures in the past six months. (*Id.*). Claimant was currently taking Trileptal and 40mg of citalopram. (*Id.*). Dr. Kumar concluded that the seizures were secondary to stress and lack of sleep and speculated that Claimant may have missed doses of medication. (*Id.*). The findings were unremarkable, other than the anxiety afflicting Claimant's psyche. (*Id.*). His physical examination found no abnormalities. (Tr. at 379). Dr. Kumar prescribed Claimant 600mg of Trileptal three times per day for seizures and 60mg Celexa (citalopram) once daily for GAD. (*Id.*).

On October 26, 2023, Dr. Kumar performed a follow-up neurological examination, describing Claimant's seizure and anxiety disorders as moderately severe. (Tr. at 375). Claimant reported aching, painful joints; a tonic-clonic seizure the day prior during which

8

he bit his tongue; and anxiety. (*Id.*). Claimant informed Dr. Kumar that he had not missed any Trileptal doses, and that he was under significant stress. (*Id.*). Claimant's mother vaguely referred to other seizures that Claimant previously suffered. (*Id.*). Dr. Kumar continued the course of citalopram for GAD and increased the course of Trileptal to 900mg in the morning and 600mg twice in the afternoon for seizures. (Tr. at 376).

During a subsequent visit on January 30, 2024, Dr. Kumar listed that Claimant's seizures and anxiety were "low-severity." (Tr. at 489). Claimant's examination was normal other than aches and pains in the joints and anxiety. (*Id.*). Though reportedly under significant stress, Claimant had not had a tonic-clonic seizure since his last appointment with Dr. Kumar on October 26, 2023. (*Id.*). Dr. Kumar planned to continue Claimant's course of Trileptal and citalopram at their current dosages. (Tr. at 490).

Claimant's seizures and anxiety remained "low-severity" on June 4, 2024. (Tr. at 499). He still reported significant stress, but had not had a tonic-clonic seizure since his last appointment with Dr. Kumar. (*Id.*). While he was consistently taking his Trileptal, Claimant discontinued his course of citalopram. (*Id.*). Claimant's mother informed Dr. Kumar of Claimant's blinking episodes and her speculation that her son suffered from Tourette's syndrome. (*Id.*). Otherwise, his physical examination was normal. (*Id.*). Dr. Kumar again prescribed the same course of medications, including citalopram, and hypothesized that Claimant may have Tourette's syndrome alongside his primary generalized epilepsy and GAD. (Tr. at 500).

### B. *Evaluations, Opinions, and Prior Administrative Findings*

#### 1. **Psychological Examination**

On January 18, 2024, psychologist Tara Bias, M.A., evaluated Claimant at ASPIRE Occupational Rehabilitation. (Tr. at 475). During the clinical interview, Claimant reported

his history of seizures, beginning when he was 17, and noted five severe episodes since February of 2023. (*Id.*). His separation from his wife in February of 2023 caused him both anxiety and depression. (*Id.*). His mother reported that during Claimant's elementary education she had "some testing done," and his "moods/temper were different," he cannot "handle problems and stress," and "if It [sic] tell him something, he doesn't remember what I told him." (*Id.*). She also informed Bias that Claimant was in speech classes and received an Individualized Education Program ("IEP") as a child. As of the time of examination, Claimant's last stint of employment was in 2022 as a box scanner for FedEx, and he cited physical health complications, learning disability, poor memory, depression, and anxiety as the reasons that he remained unable to work. (Tr. at 476). Bias described his presenting symptoms as follows: reported major depressive episodes since adolescence, past suicidal ideations, excessive anxiety, poor sleep due to uncontrolled anxiety, perfectionistic tendencies, reported academic deficiency, and poor memory. (*Id.*). She characterized these symptoms as "present over the past six months and [causing] clinically significant distress and impairment in functioning." (*Id.*).

Bias reviewed Claimant's records, which confirmed Claimant's history of grand mal ("tonic-clonic") seizures, that Dr. Kumar was his treating physician managing seizures/anxiety, and listed oxcarbazepine (Trileptal) as his only currently prescribed medication. (*Id.*). His first seizure was found to have occurred at 17 years old, and his most recent occurred in December of 2023, resulting in a blow to the head. (*Id.*). As to his education, Claimant was retained in either kindergarten or the first grade, participated in special education classes for reading, completed vocational training for construction, and graduated from high school in 1988. (Tr. at 477). Vocationally, he was last employed in 2022 (at the aforementioned FedEx job) for nine months. (*Id.*). Prior to that, he worked

10

in Walmart and Kroger warehouses, as a cashier, and as a stocker. (*Id.*). He was required to read and write for all of his jobs and to operate a scanner for his employment with FedEx. (*Id.*). While Claimant had a valid driver's license at the time of examination, he was prohibited from driving until he was seizure-free for six months. (*Id.*).

During the mental status examination performed by Bias, Claimant exhibited moderately impaired recent memory. (Tr. at 478). He was further found to have mildly compromised faculties of judgment, insight, immediate memory, concentration, and social functioning. (Tr. at 477–78). His psychomotor behavior was mildly agitated; he blinked his eyes and showed signs of possible tics. (Tr. at 477). His affect was tearful upon recalling his divorce. (*Id.*). His appearance, attitude, speech, orientation, thought processes, thought content, perception, remote memory, and persistence were all normal. (Tr. at 477–78). His mood "was remarkable for [someone with] symptoms of depression and anxiety." (Tr. at 477). He denied both suicidal and homicidal ideation. (Tr. at 478). Overall, his pace during the evaluation was variable. (*Id.*).

As to his social functioning, Claimant reported socializing with family and friends, attending church, and occasionally going out to eat. (Tr. at 479). Regarding his daily activities, he reported that he pays bills (although his mother manages household finances); receives food stamps, a medical card, and financial support from his family; cares for himself independently; and has no difficulty remaining on his feet. (*Id.*). Bias concluded that, in light of the mental status examination, Claimant may need assistance managing his funds. (*Id.*). She diagnosed Claimant with Major Depressive Disorder ("MDD"), GAD, "Academic or Educational Problem," and "Unspecified Neurocognitive Disorder." (*Id.*).

### 2.  Prior Administrative Findings

On February 9, 2024, Rabah Boukhemis, M.D., a state agency reviewing physician, evaluated Claimant's physical functioning and concluded that Claimant could perform medium work with postural and environmental limitations. (Tr. at 75–77). Dr. Boukhemis found that Claimant could stand and/or walk about six hours in an eight-hour workday; sit about six hours in an eight-hour workday; lift and carry fifty pounds occasionally and twenty-five pounds frequently; occasionally climb ramps and stairs; never climb ladders, ropes, or scaffolds; and frequently balance, stoop, kneel, crouch, and crawl. (Tr. at 75–76). Dr. Boukhemis further found that Claimant should avoid concentrated exposure to hazards. (Tr. at 77).

On reconsideration, Palle Reddy, M.D., a state agency reviewing physician, largely agreed with Dr. Boukhemis' physical assessment. (Tr. at 94–96). Dr. Reddy likewise found that Claimant could perform medium work with postural limitations and seizure precautions. (*Id.*). Dr. Reddy further opined that Claimant should avoid concentrated exposure to extreme cold, extreme heat, vibration, fumes, odors, dusts, gases, and poor ventilation, and should avoid all exposure to hazards. (Tr. at 95–96).

As to Claimant's mental impairments, Debra Lilly, Ph.D., a state agency reviewing psychologist, determined at the initial level that Claimant did not have a severe mental impairment. (Tr. at 72–74). Jeff Harlow, Ph.D., a state agency reviewing psychologist, affirmed that determination on reconsideration. (Tr. at 91–93).

### C. Testimony

#### 1. Claimant

Claimant's administrative hearing was held on October 30, 2024. He testified that he suffered from anxiety and depression. (Tr. at 37). Claimant reportedly struggled to read but was able to navigate the functional literacy (addresses, street signs) required for day-

12

to-day life. (Tr. at 38). Claimant had a driver's license "years ago," but had not driven recently due to his seizure disorder. (Tr. at 38–39). He testified that he suffered six seizures in 2023; however, as of the time of the 2024 hearing, he had not had a tonic-clonic seizure in the current year. (Tr. at 39–40, 44). Claimant was stable on his adjusted medications. (Tr. at 40–41).

Claimant's first seizure, at 17 years old, occurred during a family car ride and caused a crash. (Tr. at 39, 41). He primarily suffered seizures while sleeping, and he knew when one occurred by feelings of tiredness the next morning and/or bruising from collisions with his nightstand. (Tr. 40–42). He testified that it took days to recover from tonic-clonic night seizures. (Tr. at 42). Claimant stated that during recovery, he felt sore and weak, his memory and cognition were severely impaired, and he would lie on his couch. (Tr. at 42–43). Claimant stated that his doctor informed him that repeated seizures would "ruin [his] mind" and that a seizure can "destroy [one's] mind." (Tr. at 43). Stress was the primary trigger for his seizures, but Claimant clarified that his first seizure did not result from stress, speculating that it may have been a result of the cumulative effects of childhood injuries. (*Id.*).

Claimant testified that not all of his seizures are tonic-clonic. He testified that some manifest as "staring spells." (Tr. at 44). Claimant reported having multiple staring spells in 2024 and that each required between 30 minutes to one hour of recovery time. (Tr. at 44–45). During such recovery time, his ability to walk is impaired, his balance is weakened, and he is at risk of falling. (Tr. 45). According to Claimant, his weakness following a seizure (either tonic-clonic or staring spell) is great enough that his three children must help him to the restroom. (*Id.*). Claimant further claims that both his tonic-clonic and staring spells cause angry outbursts, consisting of screaming and occasional

violence (Tr. at 45–47). Claimant's outbursts make both family and friends wary when interacting with him. (*Id.*).

Claimant testified regarding his former employment with FedEx. (Tr. at 47). He scanned and placed boxes on trucks until the company fired him for five absences over the course of 10 months. (*Id.*). Claimant stated that each absence was due to a seizure. (*Id.*). Prior to FedEx, Claimant worked in a Walmart warehouse until 2020. (Tr. at 48–49). His duties included forklift and hand jack operation. (Tr. at 48). He was fired following an argument with a manager regarding a customer. (Tr. at 49).

Claimant explained that he lives on the property adjoining his mother's. (Tr. at 50). She takes him to his doctor's appointments and leaves her door open to him so that she can soothe him after a seizure. (Tr. at 50–51). He recalled that medication was effective in controlling his seizures in 2024, and the only side-effect was being "jittery" (Tr. at 51). In 2023, however, he reported having four tonic-clonic seizures and three staring spells. (Tr. at 52). As to his anxiety, Claimant testified that it causes irritability, impairs his ability to concentrate, causes recurrent sleeplessness and muscular tension, and diminishes his desire to socialize, as well as his persistence and pace when performing tasks. (Tr. at 53–54).

### 2. Claimant's Mother

Claimant's mother testified that Claimant lives next door and spends a significant amount of time at her home. (Tr. at 56). Over the past three to four years, Claimant's wife has called Claimant's mother during his nocturnal seizures, and she witnessed said seizures. (*Id.*). Claimant always lets his mother know when he's had a seizure, if his wife is not present to inform her. (*Id.*).

Claimant's mother testified that, in 2023, her son's tonic-clonic seizures once caused him to fall out of bed, hit his nightstand, and suffer a black eye "so severe" that he had to stay with her the next two nights to monitor him. (Tr. at 57). She stated that Claimant is drowsy the day after a nighttime seizure. (*Id.*). Claimant's mother did not observe him have a nighttime seizure in 2024, but he had, on occasion, complained of being sleepy, drowsy, or tired. (Tr. at 57–58).

Regarding Claimant's education, his mother recalled that he repeated both kindergarten and the first grade. (Tr. at 59). While the school attempted to "mainstream" Claimant through inclusion in art, physical education, and health classes, he was relegated to special education for reading and writing. (*Id.*). He was also administered an IEP each year, which continually placed him within the special education curriculum. (Tr. at 59–60).

Finally, Claimant's mother confirmed that her son struggled to concentrate, was often irritable, and suffered from poor sleep. (Tr. at 60). Said irritability and lack of sleep "affected" his social capabilities as well as his faculties of concentration and memory. (Tr. at 61).

### 3. Vocational Expert

Harry Tanzey testified that a hypothetical person of Claimant's age, education, and work experience with the RFC later adopted by the ALJ could perform jobs such as Material Handler (DOT 727.687-030), Warehouse Worker (DOT 922.687-058), and Food Prep Helper (DOT 522.686-014), all of which exist in significant numbers in the national economy. (Tr. at 63–64). However, if said hypothetical person could only understand, remember, and carry out simple work-related tasks two-thirds of the time, then that person would not be able to perform the aforementioned work. (Tr. at 64). Furthermore,

15

the VE testified that if the hypothetical person were to sporadically miss work twice a month, then he would not be able to maintain employment. (*Id.*).

Claimant's attorney then contributed to the hypotheticals. (Tr. at 65). The VE testified that the additional limitation of needing instructions repeated so often to equate to being off task 10 to 15 percent of the time was work-preclusive. (*Id.*). Finally, the VE testified that a hypothetical individual who was off task more than 10 percent of the workday due to social aversion, poor concentration, persistent drowsiness, and frequent breaks would likewise be unable to perform the previously identified work. (Tr. at 65).

## VI. <u>Standard of Review</u>

The issue before the Court is whether the final decision of the Commissioner is based upon an appropriate application of the law and is supported by substantial evidence. *See Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990). In *Blalock v. Richardson*, the Fourth Circuit Court of Appeals defined "substantial evidence" to be:

> [E]vidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."

*Blalock*, 483 F.2d at 776 (quoting *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966)). This Court is not charged with conducting a *de novo* review of the evidence. Instead, the Court's function is to scrutinize the record and determine whether it is adequate to support the conclusion of the Commissioner. *Hays*, 907 F.2d at 1456. When conducting this review, the Court does not re-weigh evidence, make credibility determinations, or substitute its judgment for that of the Commissioner. *Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 1996) (citing *Hays*, 907 F.2d at 1456)). Moreover, "[t]he fact that the record as a whole might support an inconsistent conclusion is immaterial, for the language of §

205(g) ... requires that the court uphold the [Commissioner's] decision even should the court disagree with such decision as long as it is supported by 'substantial evidence.'" *Blalock*, 483 F.2d at 775 (citations omitted). Thus, the relevant question for the Court is "not whether the claimant is disabled, but whether the ALJ's finding of no disability is supported by substantial evidence." *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005) (citing *Craig*, 76 F.3d at 589).

## VII.   Discussion

Claimant asserts two challenges to the ALJ's decision. Neither challenge warrants remand for the following reasons.

### A. Duty to Develop the Record

Claimant first argues that the ALJ failed to fully develop the record regarding his numerous physical and mental impairments, including seizure disorder, learning disability, depression, anxiety, stress, memory problems, insomnia, osteoarthritis, Bell's palsy, and possible Tourette's syndrome. (ECF No. 6 at 8–13). Relying upon *Griggs v. Schweiker*, 545 F. Supp. 475, 483 (S.D.W. Va. 1982), Claimant contends that the ALJ failed to fully develop the physical and mental RFC evaluations of his treating physicians, Dr. Kumar and Dr. McComas. (*Id.* at 8).

An ALJ has a duty to develop a full and fair record. *Cook v. Heckler*, 783 F.2d 1168, 1173–74 (4th Cir. 1986); *Griggs*, 545 F. Supp. at 483. However, a claimant bears the burden of proving disability and furnishing evidence supporting his claim. 42 U.S.C. § 423(d)(5)(A); 20 C.F.R. §§ 404.1512(a), 416.912(a); *Bowen v. Yuckert*, 482 U.S. 137, 146 n.5 (1987). Accordingly, while an ALJ must ensure that the record is sufficiently developed to permit an informed decision, the regulations do not require an ALJ to obtain additional evidence where the existing record is adequate to evaluate the claim.

17

Claimant's argument fails because he identifies no evidentiary deficiency in the administrative record. Although Claimant asserts that the ALJ failed to fully develop the physical and mental RFC evaluations of Dr. Kumar and Dr. McComas, he identifies no missing treatment records, unresolved ambiguity, consultative examination, or other evidentiary gap that prevented the ALJ from rendering an informed decision. (ECF No. 6 at 8–13). Instead, Claimant primarily relies upon evidence already contained within the administrative record, including his hearing testimony, his mother's testimony, treatment records, and the findings contained in the January 2024 ASPIRE Occupational Rehabilitation evaluation. (*Id.*). Thus, Claimant's challenge concerns the ALJ's evaluation of the evidence before him rather than the completeness of the record itself.

The record before the ALJ was extensive. The ALJ considered treatment records from Dr. McComas and Dr. Kumar, emergency treatment records from St. Mary's Medical Center, the January 2024 ASPIRE Occupational Rehabilitation evaluation, state-agency medical and psychological findings, Claimant's hearing testimony, and the testimony of Claimant's mother. (Tr. at 22–27). The ALJ discussed this evidence in detail when evaluating the severity of Claimant's impairments and formulating the RFC assessment. (*Id.*).

Significantly, although the state-agency psychological consultants concluded that Claimant's mental impairments were non-severe, the ALJ found that Claimant suffered from the severe impairment of a learning disorder and incorporated multiple mental limitations into the RFC assessment. (Tr. at 20, 25–26). The record before the ALJ therefore included, *inter alia*, treatment records from multiple providers, emergency treatment records, a psychological evaluation, prior administrative medical findings, prior administrative psychological findings, and hearing testimony from Claimant, his

18

mother, and a VE. This breadth of evidence further undermines Claimant's assertion that the record was inadequately developed.

The record reflects that the ALJ specifically considered the evidence upon which Claimant now relies. The ALJ discussed the ASPIRE evaluation, including findings concerning Claimant's memory, concentration, social functioning, and educational history, as well as his diagnoses of major depressive disorder, generalized anxiety disorder, and unspecified neurocognitive disorder. (Tr. at 24–25). The ALJ also considered Claimant's allegations regarding seizures, anxiety, memory deficits, and difficulties with concentration, in addition to the testimony provided by Claimant and his mother. (Tr. at 23–25). Thus, the decision demonstrates that the ALJ was thoroughly aware of and evaluated the evidence concerning Claimant's physical and mental impairments.

Moreover, despite repeatedly referencing Dr. Kumar and Dr. McComas, Claimant does not identify any opinion from either physician stating that he was disabled or imposing functional limitations inconsistent with the RFC assessment. The treatment records from those providers primarily document Claimant's reported symptoms, medication management, examination findings, and seizure history. *See*, *e.g.*, (Tr. at 469–73, 375–80, 489–500). Claimant therefore fails to demonstrate that the ALJ overlooked or failed to obtain any material opinion evidence from his treating providers.

Accordingly, the undersigned **FINDS** that Claimant does not demonstrate that the ALJ neglected to obtain necessary evidence or otherwise failed to adequately develop the record. Rather, the record reflects that the ALJ possessed sufficient evidence to evaluate Claimant's allegations and render an informed decision. Therefore, Claimant has not established reversible error on this basis.

19

### *B. Combination of Impairments*

Claimant next argues that the ALJ failed to consider and properly evaluate his claim under a "combination of impairments theory." (ECF No. 6 at 13–14). Claimant relies upon 42 U.S.C. § 423(d)(2) and *Hines v. Bowen*, 872 F.2d 56, 59 (4th Cir. 1989), asserting that his combination of impairments renders him disabled. (ECF No. 6 at 13–14). Claimant further contends that the ALJ failed to properly consider the records of Dr. Kumar and Dr. McComas and improperly substituted his own opinion for those of Claimant's treating physicians. (*Id.* at 14).

The Social Security Act requires consideration of the combined effect of all medically determinable impairments. 42 U.S.C. § 423(d)(2)(B); 20 C.F.R. §§ 404.1523(c), 416.923(c). Thus, an ALJ may not fragmentize a claimant's impairments and evaluate each in isolation. *See Walker v. Bowen*, 889 F.2d 47, 49–50 (4th Cir. 1989). However, an ALJ is not required to employ any particular formula or incantation when conducting the analysis. Rather, the decision must demonstrate that the ALJ actually considered the cumulative effect of the claimant's impairments. *See Brown v. Astrue*, No. 2:11-cv-00084, 2012 WL 3716792, at *6 (S.D.W. Va. Aug. 28, 2012).

The record herein does not support Claimant's contention that the ALJ failed to consider his impairments in combination. At step three, the ALJ expressly found that Claimant did not have "an impairment or combination of impairments" that met or medically equaled a listed impairment. (Tr. at 20). The ALJ then specifically evaluated Listing 11.02, addressing Claimant's seizure disorder, and Listing 12.11, addressing Claimant's mental impairments. (Tr. at 20–22). In evaluating Listing 12.11, the ALJ considered Claimant's learning disorder, anxiety complaints, concentration difficulties,

memory complaints, educational history, and daily activities when assessing the paragraph B criteria. (Tr. at 21–22).

The ALJ's consideration of Claimant's combination of impairments did not end at step three. Before assessing Claimant's RFC, the ALJ expressly recognized that he was required to consider all of Claimant's impairments, including impairments that were not severe. (Tr. at 22). The ensuing discussion reflects that he did so. The ALJ considered Claimant's seizure history, treatment records, medication management, educational limitations, memory complaints, anxiety symptoms, the findings contained in the ASPIRE evaluation, and the testimony provided by Claimant and his mother. (Tr. at 22–27). After evaluating that evidence, the ALJ imposed both physical and mental limitations, including restrictions against climbing ladders, ropes, and scaffolds; restrictions against exposure to hazards such as unprotected heights and moving machinery; limitations to simple instructions and simple tasks; limitations to two-hour periods of concentration on simple work-related tasks; a prohibition against production-rate pace work; and limitations to occasional interaction with supervisors, coworkers, and the public. (Tr. at 22).

Regarding the step three analysis, Claimant does not identify any specific listing that he believes was met or medically equaled, nor does he explain how the evidence established listing-level severity when his impairments were considered together. Instead, Claimant generally asserts that his impairments "meet or exceed the combination of impairments listing provided by the Social Security Regulations for disability." (ECF No. 6 at 13). Such a conclusory assertion is insufficient to establish reversible error, particularly where the ALJ expressly considered Claimant's impairments

21

in combination and incorporated limitations addressing both his physical and mental impairments into the RFC assessment.

Claimant's assertion that the ALJ substituted his own opinion for those of Dr. Kumar and Dr. McComas is likewise unsupported. Plaintiff identifies no opinion from either physician concluding that Claimant was disabled or imposing limitations inconsistent with the RFC assessment. The treatment records from those providers document Claimant's symptoms, treatment, medication management, and examination findings. (Tr. at 469–73, 375–80, 489–500). As Claimant identifies no treating-source opinion that the ALJ rejected or improperly disregarded, the record does not support the contention that the ALJ substituted his own opinion for that of a treating physician.

Accordingly, the undersigned **FINDS** that the ALJ adequately considered the combined effects of Claimant's impairments and that substantial evidence supports the ALJ's determination that Claimant's impairments, whether considered individually or in combination, did not render him disabled within the meaning of the Social Security Act.

## VIII.  Proposal and Recommendations

For the reasons set forth above, the undersigned respectfully **PROPOSES** that the presiding District Judge confirm and accept the foregoing findings and **RECOMMENDS** that the District Court:

1. **DENY** Claimant's request for judgment on the pleadings, (ECF No. 6);

2. **GRANT** the Commissioner's request to affirm the decision, (ECF No. 7);

3. **AFFIRM** the final decision of the Commissioner;

4. **DISMISS** this action; and

5. **REMOVE** this matter from the docket of the Court.

The parties are notified that this "Proposed Findings and Recommendations" is

22

hereby **FILED**, and a copy will be submitted to the Honorable Robert C. Chambers, United States District Judge. Pursuant to the provisions of Title 28, United States Code, Section 636(b)(1)(B), and Rules 6(d) and 72(b), Federal Rules of Civil Procedure, the parties shall have fourteen days (filing of objections) and three days (if received by mail) from the date of filing this "Proposed Findings and Recommendations" within which to file with the Clerk of this Court, specific written objections, identifying the portions of the "Proposed Findings and Recommendations" to which objection is made, and the basis of such objection. Extension of this time period may be granted by the presiding District Judge for good cause shown. Failure to file written objections as set forth above shall constitute a waiver of *de novo* review by the District Judge and a waiver of appellate review by the Court of Appeals. *Snyder v. Ridenour*, 889 F.2d 1363 (4th Cir. 1989); *Thomas v. Arn*, 474 U.S. 140 (1985); *Wright v. Collins*, 766 F.2d 841 (4th Cir. 1985); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984).

The Clerk is directed to file this "Proposed Findings and Recommendations" and to provide a copy of the same to counsel of record.

**FILED: June 11, 2026**



Omar J. Aboulhosn
United States Magistrate Judge

23